IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| EARNEST FRANCIS, JR., | : | |
| Plaintiff, | | |
| v. | : | Case No. 3:12-cv-87 |
| DAVIS H. ELLIOT | | JUDGE WALTER H. RICE |
| CONSTRUCTION CO., INC., *et al.*, | : | |
| Defendants. | | |

---

DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. #15)

---

After being terminated from his job, Earnest Francis, Jr., filed suit against his former employer, Davis H. Elliot Construction Company, Inc. ("DHE Construction"), Davis H. Elliot Company, Inc. ("DHE"), and his former supervisors Clyde Legg, Brian Sarrett and Mark Baker. His Amended Complaint alleges state law claims of race discrimination, hostile work environment and retaliation, and claims of race discrimination and retaliation under 42 U.S.C. § 1981. This matter is currently before the Court on Defendants' Motion for Summary Judgment, Doc. #15. For the reasons set forth below, that motion is sustained in part and overruled in part.

I. **Background and Procedural History**[1]

Earnest Francis, Jr., an African-American, began working in Tennessee as a lineman for DHE Construction, an electrical construction contractor, in 2007.[2] In March of 2009, he transferred to Dayton, Ohio, where he served as a foreman, typically leading a crew of four employees. Legg Decl. ¶2; Sarrett Dep. at 13. General Foremen Clyde Legg and Mark Baker, both Caucasian, were his direct supervisors. They reported to Vice President Brian Sarrett, who was headquartered in Kentucky. Pl. Dep. at 16-18.

There were very few African-American employees at the Dayton facility. Francis maintains that Legg harbored a discriminatory animus toward African-Americans. When Legg found out that Francis was being transferred to Dayton, Legg told another foreman that "there was a nigger on the way" and that "there ain't no way he could be worth a damn 'cause he was just a nigger." Phares Aff. ¶4.

Once Francis started working there, Legg often referred to him as a "stupid nigger" and a "porch monkey." Phares Aff. ¶5. Legg also referred to him as "banjo lips." Thomas Aff. ¶3. Legg assigned Francis's crew the least desirable jobs, and assigned Francis the oldest pickup truck and the crew members that no one else wanted. Phares Aff. at ¶5; Pl. Dep. at 50-51. Other white employees,

---

[1] As required when deciding a motion for summary judgment, the facts are construed in a light most favorable to the non-moving party, in this case, the plaintiff. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[2] DHE Construction is a wholly-owned subsidiary of DHE.

including Rich Stewart, Tim Stults, Travis White, "Fred," and Howard Hall, also openly referred to Francis and other African-Americans as "niggers." Pl. Dep. at 36-38, 46.

Francis maintains that he complained to Legg about the racially derogatory comments at least once a week, but nothing changed.[3] Francis also tried to contact Sarrett by phone to voice his complaints, but was not able to reach him. *Id.* at 19-20.

In early December of 2010, Rich Stewart, one of Francis's crew members, found a dirty baby doll at one of the work sites, and placed it in one of the work bins. Francis discovered the doll one morning when it fell to the ground. He maintains that the doll was black and had a string or rope tied around its neck. *Id.* at 41-42.[4] When Francis asked Stewart what kind of a sick joke it was, Stewart just grinned at him. Francis left to report the incident to Mark Baker. *Id.* Baker immediately met with the crew. Stewart took full responsibility, but denied that he meant anything racial by it. Baker told the crew that such behavior would not be tolerated, and threatened to take further action if any similar incidents occurred. Baker then talked to Francis and "asked him if what I had done was good enough, and he said everything was cool." Baker Dep. at 18-22.

---

[3] Legg denies that Francis ever complained about racial slurs being used in the workplace. Legg Dep. at 46-47.

[4] Stewart testified that he could not tell what color the doll was because it was so dirty. He denied that it had a string or rope around its neck. Stewart Dep. at 47-50. Baker testified that Francis told him that the doll was black, but said nothing about a string or rope around its neck. Baker Dep. at 17, 20-21; Baker Decl. ¶2.

In January of 2011, African-American Devon Nelloms was hired by DHE Construction as a groundsman and assigned to Francis's crew.  On February 2, 2011, after working just a couple of weeks, Nelloms turned in his uniform and told Legg that he was quitting because he was tired of the way Francis was treating him.  Nelloms Dep. at 41-42.

Sarrett happened to be in the Dayton office that day.  He asked Legg what was going on.  Sarrett and Legg then talked to Nelloms about Francis.  Nelloms, who was visibly upset, told Sarrett that Francis regularly talked to him like a dog, cussed at him, publicly demeaned him, told him he would never amount to anything, and threatened him.  Francis allegedly told Nelloms that complaining about it would do no good because Francis would "use the race card" and the company would take no action against him.  Sarrett told Nelloms that he did not want him to quit.  He promised to move him to a different crew, and to conduct an investigation into his complaints about Francis. Sarrett Dep. at 34-37.

Sarrett then asked Legg to investigate the complaint.  *Id.* at 37.  That same day, Legg interviewed five employees who worked with Francis and reported back to Sarrett.  The employees told Legg that Francis treated his crew members in a very disrespectful and abusive manner, regularly calling them "dumb asses" and "mother fuckers."  Francis also told one employee that if he wanted to get into the apprentice program, he would have to get down on his knees and suck [Francis's] dick."  The crew members told Legg that Francis often referred to his race, stating

4

that he could treat them however he wanted without any fear of discipline.  Sarrett Decl. ¶5; Sarrett Dep. at 42, 45, 65-66; Ex. 15 and 17 to Sarrett Dep.

That same day, Sarrett also talked to Mark Baker, Rich Stewart and Jeremy Ferrell about Francis.  Baker told Sarrett that, in the past, when employees had complained about Francis, Baker did his best to resolve the situation informally, but did not document those complaints or discipline Francis.  Because Francis was African-American, Baker was afraid to take any action against him. According to Baker, Francis "routinely referenced the color of his skin by pointing at his arm, moving his finger up and down, saying you guys are never going to be able to touch me, because of this, referring to the color of his skin."  Sarrett Dep. at 38-40, 46.

Sarrett found that Francis's conduct toward his crew members violated two sections of the company's policy concerning inappropriate conduct/harassment. First, it was a violation of the company's sexual harassment policy to condition a crew member's entrance into the apprenticeship program on submission to a demand for oral sex.  Second, Francis's treatment of his crew members violated the policy prohibiting conduct that creates an intimidating, hostile or offensive work environment.  Ex. 16 to Sarrett Dep.; Ex. 4 to Pl. Dep.  Sarrett found that Francis's conduct was so egregious that it warranted immediate termination. Sarrett Dep. at 46-47; Sarrett Decl. ¶6.

On February 3, 2011, Sarrett met with Francis and told him that he could either resign or be terminated.  Francis chose to resign.  Sarrett Decl. ¶8.  On

5

February 28, 2012, Francis filed suit in the Montgomery County Court of Common

Pleas, alleging state law claims of race discrimination, hostile work environment,

and retaliation under Ohio Revised Code Chapter 4112. Defendants removed the

case to federal court based on diversity of citizenship. Francis later amended his

complaint, adding claims of race discrimination and retaliation under 42 U.S.C.

§ 1981. Defendants have now moved for summary judgment on all claims.


**II.    Summary Judgment Standard**

Summary judgment must be entered "against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Celotex Corp.

v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial

responsibility of informing the district court of the basis for its motion, and

identifying those portions of the record which it believes demonstrate the absence

of a genuine issue of material fact. *Id.* at 323; *see also Boretti v. Wiscomb*, 930

F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must

present evidence that creates a genuine issue of material fact making it necessary

to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241,

1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

250 (1986). Once the burden of production has so shifted, the party opposing

summary judgment cannot rest on its pleadings or merely reassert its previous

6

allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id.* at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure* Civil 3d § 2726 (1998).

In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). "A

district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990); *see also L.S. Heath & Son, Inc. v. AT&T Info. Sys., Inc.*, 9 F.3d 561 (7th Cir. 1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992), *cert. denied*, 506 U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment . . . ."). If it so chooses, however, the court may also consider other proper Rule 56 materials in the record. Fed. R. Civ. P. 56(c)(3).

## III.    Analysis

Plaintiff's Amended Complaint alleges discrimination and a hostile work environment based on race, in violation of Ohio Revised Code § 4112.02(A),[5] and retaliation, in violation of Ohio Revised Code § 4112.02(I).[6] Francis also alleges race discrimination and retaliation in violation of 42 U.S.C. § 1981.[7]

_____

[5] That statute makes it unlawful: "(A) [f]or any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." Ohio Revised Code § 4112.02(A).

[6] That statute makes it unlawful "[f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a

8

### A. Relevant Law

As a general rule, claims of discrimination brought under Ohio Revised Code Chapter 4112 and 42 U.S.C. § 1981 are analyzed the same as discrimination claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq. See Williams v. Ford Motor Co.*, 187 F.3d 533, 538 (6th Cir. 1999) ("The Ohio Courts have held that the evidentiary standards and burdens of proof applicable to a claimed violation of Title VII . . . are likewise applicable in determining whether a violation of Ohio Rev. Code § 4112 has occurred."); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 n.5 (6th Cir. 2000) ("The elements of a *prima facie* case as well as the allocations of the burden of proof are the same for employment claims stemming from Title VII and § 1981."). Because the same analysis applies to the state and federal claims, the Court considers them together.

In an employment discrimination case, a plaintiff can withstand a motion for summary judgment either by presenting direct evidence of discrimination or by presenting circumstantial evidence from which a jury may infer a discriminatory

---

charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code." Ohio Revised Code § 4112.02(I).

[7] That statute reads, in relevant part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishments, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

motive underlying an adverse employment action. *See Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). Direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999).

Where the plaintiff has only circumstantial evidence of a discriminatory motive, most claims are analyzed under the framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). Under that framework, a plaintiff must first establish a prima facie case of discrimination. The elements of a prima facie case vary somewhat depending on the theory of discrimination being asserted. If the plaintiff is successful in establishing a prima facie case, an inference of discrimination arises and the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 802-03. If the employer offers evidence of such a reason, the presumption of discrimination drops away, leaving only the issue of "discrimination [or not]." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000).

The plaintiff must then prove by a preponderance of the evidence that the reason offered was pretextual. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). The plaintiff may prove pretext by showing either that: (1) the proffered reason had no basis in fact; (2) the proffered reason did not actually motivate the discharge; or (3) the proffered reason was insufficient to

10

motivate the discharge. *See Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994); *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 471-72 (6th Cir. 2002).

The plaintiff has the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against him or her. *Burdine*, 450 U.S. at 253. At the summary judgment stage, "the plaintiff must submit evidence from which a reasonable jury could conclude both that she has established a prima facie case of discrimination and that the defendant's legitimate, nondiscriminatory reason for its action, if any, is pretext for unlawful discrimination." *Vincent v. Brewer Co.*, 514 F.3d 489, 494 (6th Cir. 2007).

With this analytical framework in mind, the Court turns to Francis's claims of race discrimination, hostile work environment and retaliation.

### B. Race Discrimination Claims

Francis first alleges that Defendants' actions in terminating his employment violated his right to be free from discrimination based on race. Am. Compl. ¶22. He asserts both a "single motive" and a "mixed motive" theory of liability. In a "single motive" claim, the plaintiff alleges that an illegitimate reason motivated the termination. In a "mixed motive" claim, the plaintiff alleges that both legitimate *and* illegitimate reasons motivated the termination decision. Under Title VII, both theories may give rise to employer liability. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 396 (6th Cir. 2008).

11

### 1. Single Motive Theory

Because he has no direct evidence that Defendants terminated him because of his race, Francis must establish a prima facie case by showing that: (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside the protected class or treated differently than similarly-situated non-protected employees. *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008). Here, only the fourth element is in dispute.

Francis argues that he was treated differently than similarly-situated white foremen. The Sixth Circuit has held that, in order to be considered "similarly-situated," "the plaintiff and the employee with whom the plaintiff seeks to compare himself must be similar in all of the *relevant* aspects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (internal quotation omitted).

Francis maintains that although many of the white foremen also used crude language in dealing with their crew members, they were not terminated for doing so. One lineman testified that virtually all of the foremen regularly used the words "hell," "damn," "shit," and "fuck." In the construction arena, such language is commonplace. Sexton Dep. at 22-23; Legg Dep. at 57-58.

Defendants do not deny that such language is commonplace. However, as Sarrett explained, Francis "wasn't using his cuss words as adjectives describing it's damn hot today, he was using them as attacks on his employees. He was

12

demeaning. He was calling them dumb asses, mother fuckers." Sarrett Dep. at 45. Defendants correctly note that Francis has not identified any white foreman who called his crew members similar names and was not terminated.

Moreover, not only did Francis call his crew members demeaning names, but he also allegedly told one crew member that, in order to get into the apprentice program, he would have to "suck [Francis's] dick." *Id.* at 42. Francis has not identified any white foreman who conditioned opportunities for advancement on sexual favors and was not terminated. Accordingly, he has not shown that he and the white foremen were similarly situated in all relevant aspects. There is no evidence that, for the same or similar conduct, he was treated more harshly than white foremen.

Francis also argues that, in contrast to white foremen whose crew members lodged complaints about them, Defendants did not give him a chance to refute the allegations against him. He notes that Mark Baker and Brian Sarrett testified that when crew members complained about their foreman, the management team usually talked to the crew and then to the foreman to try to work out the problem. Baker Dep. at 14-15; Sarrett Dep. at 45. Here, however, once Legg and Sarrett completed their investigation into Nelloms' complaint, Francis was terminated without being given a chance to tell his side of the story. Sarrett Dep. at 46-47.

Again, Defendants argue that Francis cannot show that he was similarly-situated to the white foremen in all relevant aspects. This was not simply a disagreement between a foreman and a crew member. Rather, Sarrett viewed

13

Nelloms' complaint as a formal complaint of harassment, which implicated different procedures.  Sarrett testified that he had never before encountered complaints of this nature, and the conduct alleged was so shocking that, once the investigation was completed, he felt he had no choice but to immediately terminate Francis.  *Id.* at 49.  Francis has not identified any white foreman who engaged in similar conduct who was given the opportunity to refute the allegations prior to being terminated.

Francis argues that because he has *denied* many of the allegations levied against him by his crew members, Pl. Dep. at 26-29, there is a genuine issue of material fact concerning whether similarly-situated white foremen were treated more favorably.  For purposes of establishing a prima facie case, however, the question is not whether Francis actually engaged in the conduct alleged.  The question is whether any white foreman, accused of similarly egregious conduct that was corroborated during the course of an investigation, was treated more favorably.[8]  Because Francis has not presented any evidence that a similarly-situated foreman outside the protected class was treated more favorably with respect to the adverse employment action at issue, he cannot establish a prima facie case of race discrimination under a single motive theory.

---

[8]  To the extent that Francis argues that the proffered reason for his termination lacked a factual basis, this is relevant to the question of pretext.  *See Manzer*, 29 F.3d at 1084.

14

### 2. Mixed Motive Theory

In the alternative, Francis argues that his claim of race discrimination is subject to a "mixed motive" analysis. The *McDonnell Douglas* burden-shifting framework does not apply to mixed motive claims brought under Title VII. Rather, the plaintiff need only show that: (1) he was subjected to an adverse employment action; and (2) race was "a motivating factor" in the decision. *White*, 533 F.3d at 400 (quoting 42 U.S.C. § 2000e-2(m)). A claim survives summary judgment in a mixed-motive analysis if "there are any genuine issues of material fact concerning the defendant's motivation for its adverse employment decision." *Id.* at 402.

Defendants argue that the mixed motive analysis is limited to Title VII discrimination claims, and it is not available for claims brought under § 1981 or Ohio Revised Code Chapter 4112. Title VII prohibits employers from terminating an employee "*because of* such individual's race." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). In *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), the Supreme Court therefore held that an employer could avoid liability by showing that it would have made the same decision even if it had not taken the protected characteristic into account. In response to that decision, Congress enacted the Civil Rights Act of 1991, and specifically amended Title VII by adding 42 U.S.C. § 2000e-2(m), which states that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other

15

factors also motivated the practice."  In so doing, Congress created the "mixed motive" theory.

In contrast, Congress did not amend 42 U.S.C. § 1981 in a similar fashion, although the Civil Rights Act of 1991 did make other changes to that statute. Accordingly, in *Aquino v. Honda America, Inc.*, 158 F. App'x 667 (6th Cir. 2005), the court held that the mixed motive analysis does not apply to discrimination claims brought under § 1981.  Rather, § 1981 claims are subject to the *McDonnell Douglas* burden-shifting analysis.  *Id.* at 676.  *But see Bobo v. United Parcel Service, Inc.*, 665 F.3d 741, 757 (6th Cir. 2012) (applying, without discussion, a mixed motive analysis to Title VII and § 1981 discrimination claims); *Williams v. Zurz*, No. 10-4161, 2012 WL 5351270, at *8 (6th Cir. Oct. 30, 2012) (noting the apparent conflict between *Aquino* and *Bobo*, but finding it unnecessary to resolve the issue).

The Sixth Circuit's holding in *Aquino* is consistent with two more recent cases addressing the proper scope of the mixed motive theory.  In *Gross v. FBL Financial Services., Inc.*, 557 U.S. 167, 174 (2009), the Supreme Court refused to apply a mixed motive analysis to claims brought under the Age Discrimination in Employment Act ("ADEA"), noting that Congress had specifically amended Title VII to permit claims where protected status was "a motivating factor," but had not made analogous changes to the ADEA.  Likewise, in *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 317-18 (6th Cir. 2012), the court refused, for the same reason, to apply a mixed motive analysis to claims brought under the Americans

16

with Disabilities Act. Based on these cases, this Court finds that the mixed motive analysis is not available for claims brought under § 1981.

Likewise, the Ohio legislature has not amended Ohio Revised Code § 4112.02(A) to include claims where race is "a motivating factor." It still requires the plaintiff to show discrimination "because of" membership in a protected class. Nevertheless, Ohio case law is "less than settled whether mixed-motive claims are viable in the context of R.C. 4112.02(A)." *Veal v. Upreach, LLC*, 10th Dist. Franklin No. 11AP-192, 2011-Ohio-5406, ¶31. *See also Clinton v. Faurecia Exhaust Sys., Inc.*, 2d Dist. Miami No. 2012-CA-1, 2012-Ohio-4618, ¶58.

In the Court's view, for the reasons set forth in *Aquino*, *Gross*, and *Lewis*, the mixed-motive analysis is not available for discrimination claims brought under § 4112.02. But even assuming that Francis could proceed on a mixed motive theory, he has still failed to present evidence from which a reasonable jury could find that his race was "a motivating factor" in the adverse employment decision.

It appears to be undisputed that Sarrett was the sole decisionmaker, *see* Sarrett Dep. at 79 and Legg Dep. at 35, and Francis does not argue that Sarrett harbored any kind of a racially discriminatory animus whatsoever. Nevertheless, Francis maintains that *Legg's* racial animus significantly influenced the circumstances that resulted in Francis's termination, and that a reasonable jury could therefore find that race was a motivating factor in the decision.

In support of this theory, Francis relies on the case of *Johnson v. Kroger Co.*, 319 F.3d 858 (6th Cir. 2003), in which an African-American male was

terminated from his position as an assistant store manager.  There was some

evidence that the store manager, who was his direct supervisor, was racially

biased and treated Johnson less favorably than assistant managers who were

white.  The store manager told others that he was afraid that business would

suffer, and warned his employees to be careful about the kinds of jokes they told.

He told his department heads that Johnson was not very intelligent and would

need their assistance.  He often criticized Johnson in public, blamed him for things

that were not his fault, and took little interest in mentoring him.  *Id.* at 862.

When a new regional manager came on board, she and the store manager

prepared a performance evaluation, rating Johnson's performance as "marginal."

Shortly thereafter, following another consultation with the store manager, she

encouraged Johnson to pursue a nonmanagement position.  When he declined the

offer, she terminated him and he sued, alleging race discrimination.  *Id.* at 863-64.

The district court granted summary judgment in favor of the employer.  The

Sixth Circuit, in a split decision, reversed, concluding that a reasonable jury could

find that the proffered reason did not actually motivate the discharge.  The court

held that, even though the regional manager was the decisionmaker, the racial bias

of the store manager was still relevant and, although it was a "close case," a jury

could reasonably find the store manager had played a significant role in the

decisionmaking process.  *Id.* at 868-69.

In the Court's view, *Johnson* is factually distinguishable.  Although Legg

was Francis's direct supervisor and there is evidence to support a finding that he

was racially biased, there is no evidence that he sought to influence Sarrett's decision, or actually did so. Significantly, Sarrett did not seek Legg's recommendation concerning whether Francis should be terminated. Sarrett Dep. at 79. Sarrett asked Legg to talk to Nelloms, and then to Francis's crew members, and to report his findings. There is absolutely no evidence that Legg sought to influence the content of their responses to his questions, or that he falsely reported what the crew members told him. *Compare Chattman v. Toho Tenax America, Inc.*, 686 F.3d 339, 353 (6th Cir. 2012) (holding that where a biased human resources manager "actively inserted himself in the decisionmaking process" and "misinformed and selectively informed" the decisionmakers about the incident in question, genuine issues of material fact existed as to causation).

*Johnson* is also factually distinguishable in that there was evidence to support a finding that the regional manager, who made the termination decision, was also racially biased. She allegedly treated Johnson "unprofessionally and disrespectfully, using a hateful tone of voice that she did not use when speaking to Caucasian employees." 319 F.3d at 863. In contrast, there is no evidence that Sarrett harbored a discriminatory animus.

Two more recent Sixth Circuit cases have distinguished *Johnson*. In *Harris v. Giant Eagle Inc.*, 133 F. App'x 288 (6th Cir. 2005), the court found that racist comments made by the plaintiff's direct supervisor, although relevant, were insufficient to create a genuine issue of material fact as to whether race was a motivating factor in the termination decision when there was no evidence showing

19

that the supervisor's racial animus "was the cause of the termination or somehow influenced the ultimate decisionmaker." *Id.* at 295-96 (quoting *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 877 (6th Cir. 2001)). Likewise, in *Lockett v. Marsh USA, Inc.*, 354 F. App'x 984, 994-95 (6th Cir. 2009), where there was no evidence that a person accused of race and gender bias had any role in the elimination of the plaintiff's position, and the discriminatory statements were not related in any way to that decision, those remarks were not sufficient to establish a discriminatory motive.

In short, Legg's alleged racial bias is certainly relevant to Francis's claim but, absent any evidence that Legg somehow skewed the outcome of the investigation or otherwise influenced Sarrett's decision, it is insufficient to create a genuine issue of material fact concerning whether race was "a motivating factor" in the termination decision. Legg may have had the *opportunity* to influence Sarrett's decision, but there is no evidence that he actually did so.

For similar reasons, a "cat's paw" theory of liability is inapplicable. As explained in *Roberts v. Principi*, 283 F. App'x 325 (6th Cir. 2008), under this theory, "the subordinate, not the nominal decisionmaker, is the driving force behind the employment action." *Id.* at 333. When the decisionmaker relies entirely on the recommendation of the biased subordinate, then the decisionmaker becomes a "mere conduit" for the discriminatory animus, and the employer is liable. *Id.* (quotation omitted).

20

Here, there is simply no evidence to support a finding that Legg was the driving force behind the termination.  Sarrett discussed the results of the investigation with Legg, but did not seek Legg's recommendation.  Moreover, Sarrett did not rely entirely on Legg's account of what the crew members reported. Sarrett also personally talked to Nelloms, and to Mark Baker, Rich Stewart and Jeremy Ferrell.  Sarrett Dep. at 46.  As the court noted in *Roberts*, "when a decisionmaker makes a decision based on an independent investigation, any causal link between the subordinate's [discriminatory] animosity and the adverse action is severed."  283 F. App'x at 333.  *See also Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 836 (6th Cir. 2012) (holding that where employer conducted an independent investigation and still concluded that the termination decision was entirely justified, the causal chain was broken).

Under the circumstances presented here, Legg's racial bias cannot be imputed to Sarrett.  No reasonable jury could find that Francis was terminated "because of" his race, or that his race was "a motivating factor" in Sarrett's decision.  The Court therefore sustains Defendants' Motion for Summary Judgment on Francis's race discrimination claims brought under 42 U.S.C. § 1981 and Ohio Revised Code § 4112.02(A).

### C. Hostile Work Environment

In addition to offering employees protection from disparate treatment based on race, the law also offers protection from a workplace "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or

21

pervasive to alter the conditions of the victim's employment and create an abusive

working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)

(internal quotations omitted).

In Count 2 of his Amended Complaint, Francis alleges that he was subjected

to a racially hostile work environment. Am. Compl. ¶24. To establish a prima

facie case of a racially hostile work environment against an *employer*, Francis must

demonstrate that: (1) he is a member of a protected class; (2) he was subjected to

unwelcome harassment; (3) the harassment was based on race; (4) the harassment

unreasonably interfered with his work performance by creating an intimidating,

hostile, or offensive work environment; and (5) there is some basis for imposing

vicarious liability on the employer. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515

(6th Cir. 2009).

Notably, Defendants do not argue that Francis failed to establish the first

four elements of a prima facie case, and the Court makes no determination

concerning whether the alleged harassment was "sufficiently severe or pervasive

to alter the conditions" of his employment. *See Harris*, 510 U.S. at 21.

Defendants' motion is directed solely at the fifth element, employer liability.

Analysis of employer liability differs depending on whether the alleged

harasser is the victim's supervisor or a coworker. *Id.* at 516.

> Where the harassment is attributed to a supervisor with immediate or
> successively higher authority over the employee, a court looks first to
> whether the supervisor's behavior "culminate[d] in a tangible
> employment action" against the employee, *Burlington Indus., Inc. v.
> Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257, 141 L.Ed.2d 633; if it did,

22

"the employer will, ipso facto, be vicariously liable," *Mack v. Otis Elevator Co.*, 326 F.3d [116] at 124 [(2d Cir.2003)]. In the absence of such tangible action, an employer will still be liable for a hostile work environment created by its supervisors unless it successfully establishes as an affirmative defense that (a) it "exercised reasonable care to prevent and correct promptly any [racially] harassing behavior," and (b) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257, 141 L.Ed.2d 633; accord *Faragher v. City of Boca Raton*, 524 U.S. at 807, 118 S.Ct. 2275, 141 L.Ed.2d 662; *Mack v. Otis Elevator Co.*, 326 F.3d at 125.

*Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 274 (6th Cir. 2009)

(quoting *Petrosino v. Bell Atlantic*, 385 F.3d 210, 225 (2d Cir. 2004)). In

contrast, an employer may be held liable for harassment by a *coworker* if "the

employer knew or should have known of the harassment and failed to take

immediate and appropriate corrective action." *Hawkins v. Anheuser-Busch, Inc.*,

517 F.3d 321, 332 (6th Cir. 2008).

As the Court understands Francis's claim, he alleges that his supervisor --

Clyde Legg -- *and* his coworkers all played a part in creating a racially hostile work

environment. Nevertheless, Defendants' Motion for Summary Judgment appears

to be directed solely to the question of whether the affirmative defense established

in *Ellerth/Faragher* absolves the company of vicarious liability for *Legg's*

harassment. Accordingly, the Court will discuss this aspect of the claim first.

### 1. Vicarious Liability for Harassment by Supervisor

As noted in *Gallagher*, the threshold question is whether Legg's harassment

culminated in a tangible employment action. If it did, the employer is vicariously

23

liable.  Certainly, Francis suffered a tangible employment action when Sarrett gave

him the choice of resigning or being terminated.  However, for the reasons

previously discussed, the Court finds that Legg's conduct did not precipitate that

result.  The Court will, therefore, consider the affirmative defense.  *See Theus v.*

*GlaxoSmithKline*, 452 F. App'x 596, 601 (6th Cir. 2011) (holding that when the

harassing "supervisor does not cause the victim to experience a tangible

employment action, employers still have an affirmative defense" available);

*compare Pennsylvania State Police v. Suders*, 542 U.S. 129, 140-41 (2004)

(holding that the affirmative defense is not available "when a supervisor's official

act precipitates the constructive discharge").

     In order to benefit from the affirmative defense, Defendants must first

establish that the company "exercised reasonable care to prevent and correct

promptly" any harassing behavior.  *Faragher*, 524 U.S. at 807.  Second, they must

establish that Francis "unreasonably failed to take advantage of any preventive or

corrective opportunities provided by the employer or to avoid harm otherwise."  *Id.*

Generally, an employer will be found to have exercised reasonable care when it has

"promulgated and enforced" a harassment policy.  *Thornton v. Fed. Express Corp.*,

530 F.3d 451, 456 (6th Cir. 2008).  The Sixth Circuit has held that one must look

beyond the face of the policy "to determine whether the policy was effective in

practice in reasonably preventing and correcting any harassing behavior."  *Clark*,

400 F.3d at 349.

DHE's  policy on "Inappropriate Conduct/Harassment" states that the

company "is committed to providing a work environment for its employees free

from all forms of discrimination, harassment and inappropriate conduct."  Ex. 4 to

Pl. Dep.  Francis testified that he received a copy of this policy and attended the

training that the Company provided.  Pl. Dep. at 22-24.

The policy provides that inappropriate conduct will not be tolerated; all

complaints will be investigated and appropriate action will be taken.

> Any employee, who believes he/she has been subjected to
> inappropriate conduct, discrimination, or harassment, including sexual
> harassment, by a co-worker, supervisor, manager, agent, customer or
> visitor to the Company, should immediately report the matter to their
> supervisor.  If you do not feel you can report an incident to your
> supervisor, you are encouraged to bring the matter to the immediate
> attention of Karen Cobble, Manager of Administration (Corporate
> Office), Glenn Thomsen, the EEO Officer, or any member of the
> management team.  Mrs. Cobble and Mr. Thomsen can be reached at
> (540) 344-1294 or at 28A Kirk Avenue, SW, Roanoke, VA  24011.

Ex. 4 to Pl. Dep.

Defendants maintain that the policy was enforced.  They note that when

Francis complained about the baby doll incident, Baker took immediate action and

reprimanded the crew members.  Rich Stewart said that Baker gave him "an ass

chewing."  Stewart Dep. at 57.  Baker told the crew members that this type of

behavior would not be tolerated, and threatened to take disciplinary action if

anything like it ever happened again.  Baker then asked Francis "if what [he] had

done was good enough, and he said everything was cool."  Baker Dep. at 22.

Defendants also note that when Nelloms complained about Francis, the company

launched an immediate investigation and, based on the results of that investigation, Sarrett terminated Francis for violating the policy.

Francis argues, however, that a reasonable jury could find that the policy was not effective. He maintains that he complained to Legg on a weekly basis about the use of racially derogatory terms at the Dayton facility, but nothing changed. In the Court's view, because Legg was also the primary culprit, this fact speaks little of the overall effectiveness of the policy. Instead, it speaks more to the question of whether Francis unreasonably failed to take advantage of corrective opportunities provided by the employer.

*Gallagher* is instructive in this regard. In that case, as here, the plaintiff alleged that her supervisor and her coworkers created a hostile work environment. Her employer argued that it was entitled to the *Ellerth/Faragher* affirmative defense. The plaintiff had complained to her supervisor, Greg Quast, about the harassment, as instructed by the company's sexual harassment policy. The court found, however, that "[l]imiting her reports of harassment to Quast alone was clearly unreasonable" because it was clear that "Quast was part of the problem, not the solution." 567 F.3d at 276.

The court noted that even though the policy provided "alternative avenues for reporting harassment where an employee's supervisor is involved in the harassment," *id.*, the plaintiff had taken no further steps to make her employer aware of the harassment so that the problem could be resolved. The court found that this undercut her effort to impose vicarious liability on her employer "based on

26

Quast's supervisory complicity in the harassment," and rendered her claims of supervisor harassment "vulnerable to summary judgment." *Id.* at 276. It concluded that "Quast's knowledge alone is insufficient to warrant imposing liability on [the company] for supervisor harassment." *Id.* at 277. *See also Shields v. Federal Exp. Customer Info. Servs. Inc.*, No. 10-4494, 2012 WL 3893099, at *8 (6th Cir. Sept. 7, 2012) (noting that "complaining directly to the harasser may not be sufficient to show compliance with an anti-harassment policy").

     As in *Gallagher*, Francis failed to take advantage of other avenues for reporting Legg's racially derogatory statements. The policy specifically provided that if an employee did not feel comfortable reporting an incident to his supervisor, he should instead contact Karen Cobble, Glenn Thomsen, or any other member of the management team. It is undisputed that Francis made no effort to contact Cobble or Thomsen. Pl. Dep. at 21-22. He testified that he tried to contact Brian Sarrett several times but could never get him on the phone. *Id.* at 20. But because there is no evidence that Francis ever left a message telling Sarrett why he wanted to talk to him, Sarrett cannot be charged with ignoring complaints of racial harassment. Because Francis did not put the company on adequate notice of Legg's racially derogatory statements or give the company an opportunity to correct the problem, the company cannot be held vicariously liable.

     Based on the evidence presented, the Court finds that Francis has failed to produce sufficient evidence to create a genuine issue of material fact as to

whether the company exercised reasonable care to prevent and correct promptly any harassing behavior, and whether he unreasonably failed to take advantage of corrective opportunities provided.  The Court therefore concludes that DHE and DHE Construction are entitled to the affirmative defense established in *Ellerth/Faragher.*  Although DHE and DHE Construction are entitled to summary judgment on Francis's hostile work environment claim based on harassment by a *supervisor*, the same is not true with respect to his claim based on harassment by his *coworkers*.

### 2.  Vicarious Liability for Harassment by Coworkers

Francis alleges that he was subjected to racial harassment not only by Legg, but also by his coworkers.  Specifically, he alleges that Rich Stewart, Tim Stults, Travis White, "Fred," and Howard Hall, openly referred to him and other African-Americans as "niggers."  Pl. Dep. at 36-38, 46.  He also alleges that Rich Stewart had a black baby doll with a noose around its neck.

Notably, the affirmative defense discussed above does not apply to claims involving harassment by coworkers.  Rather, as noted earlier, an employer may be held vicariously liable for harassment by coworkers if "the employer knew or should have known of the harassment and failed to take immediate and appropriate corrective action."  *Hawkins*, 517 F.3d at 332.

The Court turns first to Francis's claims involving his coworkers' regular use of racially derogatory terms.  Based on the evidence presented, a reasonable jury

could find that the company knew or should have known of this harassment and failed to take immediate and appropriate corrective action.

Under this scenario, Legg's knowledge of Francis's complaints of coworker harassment is imputed to the company. "An employer is deemed to have notice of harassment reported to any supervisor or department head who has been authorized – or is reasonably believed by a complaining employee to have been authorized – to receive and respond to or forward such complaints to management." *Gallagher*, 567 F.3d at 277. DHE's policy expressly states that complaints should be reported to the employee's supervisor. In this case, that was Clyde Legg. Therefore, even though Legg was also part of the problem, his knowledge of Francis's complaints of coworker harassment is properly imputed to the company. *Id.*

Moreover, Defendants have presented no evidence to support a finding that, in response to Francis's complaints, the company took any action whatsoever to put an end to the employees' use of racially derogatory language. A jury could therefore reasonably find that the company failed to respond appropriately.

The Court turns next to Francis's complaint about the baby doll incident. Because Francis reported the incident to Mark Baker, who was also one of Francis's supervisors, the company is charged with knowledge. Defendants argue that Baker took immediate and appropriate corrective action by talking to the crew members and cautioning them that future similar conduct would subject them to

29

disciplinary action. Francis, however, argues that Rich Stewart should have been fired on the spot. Pl. Dep. at 43.

In the Court's view, genuine issues of material fact preclude summary judgment on this portion of Francis's claim also. Notably, the parties dispute whether the baby doll was black or just very dirty, whether it actually had a string or a rope tied around its neck, and whether Francis told Baker that it had a string or rope tied around its neck. The adequacy of Baker's response to Francis's complaint depends, in large part, on the resolution of these factual disputes. *See Greenwood v. Delphi Auto. Sys., Inc.*, 257 F. Supp. 2d 1047, 1065 (S.D. Ohio 2003) (noting that the appropriateness of an employer's response depends, in part, on the severity of the alleged harassment). The Court also finds it significant that, according to Francis, even after Baker reprimanded Stewart, Francis still had "plenty" of problems with Stewart. Francis characterized Stewart as a "prankster," and testified that "with me, it was a racial thing." Pl. Dep. at 44-45. This further calls into question whether Baker's response to the baby doll incident was adequate.

For these reasons, summary judgment is inappropriate on the question of whether DHE and DHE Construction are vicariously liable on Francis's hostile work environment claim based on harassment by his coworkers.

### 3. Individual Liability

Having resolved issues concerning *employer* liability on Francis's hostile work environment claim, the only remaining question is whether the *individual*

defendants -- Legg, Baker, and Sarrett – are entitled to summary judgment on this same claim. Although Ohio Revised Code Chapter 4112 and 42 U.S.C. § 1981 allow for supervisors to be held personally liable, that liability cannot be predicated on the discriminatory acts of other employees. Rather the supervisor must have had some personal involvement in the allegedly discriminatory conduct. *See Allen v. Ohio Dep't of Rehab. & Corr.*, 128 F. Supp. 2d 483, 495 (S.D. Ohio 2000) (holding that individual liability under § 1981 requires personal involvement in the discriminatory action); *Genaro v. Central Transport, Inc.*, 84 Ohio St. 3d 293, 300, 703 N.E.2d 782, 787 (Ohio 1999) ("individual supervisors and managers are accountable for their own discriminatory conduct" under Chapter 4112).

Based on the evidence presented, a reasonable jury could find that Clyde Legg was personally involved in creating a racially hostile work environment. Francis has testified that Legg regularly used racially derogatory language and, when Francis complained about it, Legg did nothing. Likewise, a reasonable jury could find that Mark Baker was personally involved in perpetuating a hostile work environment by "failing to prevent or correct the harassing conduct of other employees." *Wille v. Hunkar Lab., Inc.*, 132 Ohio App. 3d 92, 102, 724 N.E.2d 492, 499 (Ohio Ct. App. 1998). As noted above, there is a genuine issue of material fact concerning whether Baker adequately responded to Francis's complaint about the baby doll incident.

For these reasons, the Court finds that genuine issues of material fact preclude summary judgment on Francis's hostile work environment claims brought

against Legg and Baker. However, because there is no evidence in the record to support a finding that Brian Sarrett played any part in creating or perpetuating the allegedly hostile work environment, the Court concludes that he is entitled to summary judgment in his favor on this claim.

### D. Retaliation

Finally, Francis alleges that Defendants retaliated against him by terminating his employment because he complained about the baby doll incident. Pl. Dep. at 39. In order to establish a prima facie case of retaliation, Francis must show that: (1) he engaged in protected activity; (2) his exercise of protected rights was known to Defendants: (3) Defendants thereafter took an adverse employment action against him; and (4) there was a causal connection between the protected activity and the adverse employment action. *Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 792 (6th Cir. 2000).

Defendants maintain that Francis cannot establish the requisite causal connection between his December 2010 complaint about the doll and his February 2011 termination. Citing *Nguyen v. City of Cleveland*, 229 F.3d, 559, 563 (6th Cir. 2000), they argue that Francis has not produced "sufficient evidence from which an inference could be drawn that the adverse action would not have been taken" had Francis not complained about the baby doll incident.

Francis maintains that the close temporal proximity between his complaint and his termination is sufficient to establish the requisite causal connection. *See e.g., Singfield v. Akron Metropolitan Hous. Auth.*, 389 F.3d 555, 563 (6th Cir.

32

2004) (holding that a mere three-month gap constituted sufficient evidence of a causal connection for purposes of establishing a prima facie case). Although case law on this subject is still somewhat unsettled, the Sixth Circuit has "repeatedly cautioned against inferring causation based on temporal proximity alone." *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 471-72 (6th Cir. 2012).[9]

Moreover, where there is an intervening legitimate reason to terminate the employee, "that reason dispels an inference of retaliation based on temporal proximity." *Id. See also Aaron v. Ford Motor Co.*, No. 3:09-cv-2549, 2011 WL 2149419, at *5 (N.D. Ohio May 31, 2011) (even though the plaintiff was fired just one month after filing a complaint of harassment, other evidence clearly suggested a legitimate, nonretaliatory reason for her termination, thereby "break[ing] the temporal causal chain"); *Parks v. City of Chattanooga*, 74 F. App'x 432, 438 (6th Cir. 2003) ("temporal proximity alone . . . does not support an inference of retaliatory discrimination, particularly where, as here, an employee's discharge is readily explainable on non-retaliatory grounds that have not been shown to be pretextual"). In this case, the evidence clearly suggests that Francis's termination was precipitated by Nelloms' complaint of mistreatment and the ensuing investigation. The Court therefore finds that, under the circumstances presented here, temporal proximity is not enough to establish a causal connection.

---

[9] Francis argues that causation may also be inferred from the fact that after he complained about the baby doll incident, Defendants treated him less favorably than other foremen by not giving him an opportunity to respond to Nelloms' allegations before they terminated him. But, as previously discussed, he has failed to show that he was similarly situated to the other foremen in all relevant aspects.

Notably, even if Francis had established a prima facie case of retaliation, his claim still would not survive summary judgment.  Defendants have satisfied their burden of producing evidence of a legitimate, non-retaliatory reason for the adverse employment action.  According to Sarrett, Francis was terminated because he violated the company policies that prohibit *quid pro quo* sexual harassment, and the harassment and intimidation of employees.

The burden then shifts back to Francis to prove that the reason given was pretextual.  Based on the evidence presented, no reasonable jury could find that the proffered reason was a pretext for retaliation.  Francis speculates that because Legg harbored a racial animus, Legg probably became distressed when he learned that Francis had complained to Baker about the baby doll incident.  Francis further speculates that after Nelloms complained of mistreatment, Legg seized the opportunity to get rid of Francis by negatively influencing the course of the investigation.  Francis, however, points to absolutely no evidence to support such a theory, and there is no evidence in the record to support a finding that Legg had a retaliatory motive.[10]

Francis also points to the fact that Sarrett discussed the baby doll incident with Baker and Legg during the course of the investigation into Nelloms' complaint, the day before Sarrett terminated him.  Citing *Imwalle v. Reliance Medical Products, Inc.*, 515 F.3d 531 (6th Cir. 2008), Francis argues that this is further

---

[10] Defendants note that, in January of 2011, after Francis had complained about the doll, Baker and Legg provided Francis with a brand new pickup truck, an act entirely inconsistent with any inference of retaliation.

34

evidence of pretext.  In *Imwalle*, the plaintiff was terminated immediately after his supervisor told him that he could not understand why the plaintiff had filed a claim of discrimination.  The court found that the fact that the supervisor made this statement about the discrimination complaint at such a critical moment shows that it was "at the forefront of [his] mind" and raised questions regarding the true motivation for the termination.  *Id.* at 550.

This case is factually distinguishable.  When Sarrett ordered the investigation into Nelloms' complaint, Sarrett knew nothing of Francis's previous complaint of discrimination.  Baker told him about it during the course of the investigation only because Baker thought that it was rather odd and somewhat ironic that Francis had complained about being a victim of racial harassment and yet regularly told his crew members that, because he was African-American, he could treat them however he wanted without fear of discipline.  Sarrett Dep. at 65.  Moreover, in contrast to *Imwalle*, Sarrett did not mention the complaint when he terminated Francis.  Under the circumstances presented here, the mere fact that the complaint was briefly discussed the day before Francis was terminated does not give rise to an inference of retaliation.

Francis has failed to present sufficient evidence to create a genuine issue of material fact concerning whether the reason given for his termination was pretextual.  Reasonable minds would have to conclude that Sarrett's decision to terminate him was precipitated by Nelloms' complaint and the results of the ensuing investigation, not by Francis's complaint about the baby doll incident two

35

months earlier. Accordingly, the Court sustains Defendants' Motion for Summary Judgment on the retaliation claim.

## IV.    Conclusion

For the reasons set forth above, Defendants' Motion for Summary Judgment (Doc. #15) is OVERRULED IN PART and SUSTAINED IN PART. Having found no genuine issue of material fact with respect to Francis's claims of race discrimination and retaliation, the Court SUSTAINS Defendants' motion on those claims and DISMISSES them WITH PREJUDICE.

As to Francis's hostile work environment claim against *DHE Construction and DHE*, the Court: (1) SUSTAINS Defendants' motion with respect to the claims of harassment by supervisor Clyde Legg; and (2) OVERRULES Defendants' motion with respect to the claims of coworker harassment. As to Francis's hostile work environment claim against the *individual defendants*, the Court: (1) OVERRULES Defendants' motion with respect to Clyde Legg and Mark Baker; and (2) SUSTAINS Defendants' motion with respect to Brian Sarrett.


Date: March 11, 2013                    _____

                                        WALTER H. RICE
                                        UNITED STATES DISTRICT JUDGE